RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0218p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

QUICKWAY TRANSPORTATION, INC.,

     *Petitioner/Cross-Respondent*,

  *v.*

NATIONAL LABOR RELATIONS BOARD,

     *Respondent/Cross-Petitioner*,

GENERAL DRIVERS, WAREHOUSEMEN & HELPERS, LOCAL UNION NO. 89,

     *Intervenor.*

⎤
⎟
⎟
⎟
⎟
⎟
⎬   Nos. 23-1780/1820
⎟
⎟
⎟
⎟
⎟
⎦

—————————

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.

Nos. 09-CA-251857; 09-CA-254584; 09-CA-255813;
09-CA-257750; 09-CA-257961; 09-CA-270326; 09-CA-272813.

Argued: July 24, 2024

Decided and Filed: September 11, 2024

Before: MOORE, MURPHY, and BLOOMEKATZ, Circuit Judges.

—————————

## COUNSEL

**ARGUED:** R. Eddie Wayland, KING & BALLOW LAW OFFICES, Nashville, Tennessee, for Petitioner/Cross-Respondent. Joel A. Heller, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Pamela M. Newport, HERZFELD, SUETHOLZ, GASTEL LENISKI & WALL, PLLC, Cincinnati, Ohio, for Intervenor. **ON BRIEF:** R. Eddie Wayland, Michael D. Oesterle, Marykate E. Williams, KING & BALLOW LAW OFFICES, Nashville, Tennessee, for Petitioner/Cross-Respondent. Joel A. Heller, Elizabeth A. Heaney, Ruth E. Burdick, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Pamela M. Newport, HERZFELD,

SUETHOLZ, GASTEL LENISKI & WALL, PLLC, Cincinnati, Ohio, Michael J. Wall, HARZFELD, SUETHOLZ, GASTEL LENISKI & WALL, PLLC, Nashville, Tennessee, Maneesh Sharma, AFL-CIO, Washington, D.C., for Intervenor.

MOORE, J., delivered the opinion of the court in which BLOOMEKATZ, J., concurred. MURPHY, J. (pp. 35–43), delivered a separate opinion concurring in the judgment.

––––––––––––––––––

**OPINION**

––––––––––––––––––

KAREN NELSON MOORE, Circuit Judge.    Quickway Transportation, Inc. ("Quickway") petitions this court for review of a National Labor Relations Board ("Board") order in an unfair labor practice proceeding against Quickway.    The Board brings a cross-application for enforcement of its order.    Quickway argues that substantial evidence does not support the Board's findings that (1) Quickway's cessation of operations at its Louisville terminal violated the National Labor Relations Act ("NLRA" or "Act"); (2) Quickway failed to bargain over the cessation of operations and the resulting effects in violation of the Act; and (3) Quickway threatened and interrogated its employees in violation of the Act.    Quickway further argues that the Board's remedial order imposes an undue burden on it and exceeds the Board's statutory authority.    For the following reasons, we **DENY** Quickway's petition for review and **GRANT** the Board's cross-application for enforcement of its order in full.

## I. BACKGROUND

### A.  Statutory Framework

Section 7 of the NLRA guarantees the right of employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  To effectuate the protection of these rights, Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" Section 7 rights.  *Id.* § 158(a)(1).  Section 8(a)(3) makes it an unfair labor practice for an employer to "discriminat[e] in regard to hire or

tenure of employment or any term or condition of employment to . . . discourage membership in any labor organization," and Section 8(a)(4) makes it an unfair labor practice to retaliate against an employee for filing a charge with the Board. *Id.* § 158(a)(3), (4). Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." *Id.* § 158(a)(5). "[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d).

## B. Factual Background

### 1. Quickway's Operations

Quickway is a commercial motor carrier affiliated with Paladin Capital, Inc. ("Paladin") and Paladin's Quickway Group ("Quickway Group"). Joint App'x at 2 (Board Dec. at 2). The Quickway Group operates seventeen trucking terminals throughout the country, thirteen of which belong to Quickway. Nine of the Quickway Group's terminals exclusively serve The Kroger Company. *Id.*

In 2014, Quickway entered a contract to service the Kroger Distribution Center (KDC) in Louisville, Kentucky. *Id.* Under this KDC agreement, Quickway drivers at its Louisville terminal delivered outbound bulk grocery items from the KDC to Kroger grocery stores and provided limited inbound delivery services to the KDC. *Id.* at 633 (Hr'g Tr. at 996) (McCurry Direct). Quickway's service of the KDC constituted 96.5% of Quickway's Louisville terminal's annual revenue. *Id.* at 1000 (Hr'g Tr. at 1645) (Cannon Direct). The terminal generated around $900,000 to $1 million in annual profits. *Id.* at 806 (Hr'g Tr. at 1297) (Prevost Direct).

The Louisville terminal employed approximately 62 drivers and included a main terminal in Louisville and two satellite locations in Versailles and Franklin, Kentucky. *Id.* at 1001 (Hr'g Tr. at 1648) (Cannon Direct). In addition to the three locations that made up the Louisville terminal, some Louisville drivers were temporarily assigned to work at other Quickway terminals, including in Hebron, Kentucky. *Id.* at 301–02 (Hr'g Tr. at 294–95) (Cannon Direct). Quickway drivers from other terminals—including from Murfreesboro, Tennessee and

Indianapolis, Indiana—were also assigned routes that brought them to the KDC.  *Id.* at 299 (Hr'g Tr. at 292) (Cannon Direct).

Quickway was the secondary carrier at the KDC.  *Id.* at 374 (Hr'g Tr. at 424) (Obermeier Cross).[1]  The KDC's primary carrier was Transervice, *id.*, and a third company, Zenith Logistics, operated the warehouse, *id.* at 376 (Hr'g Tr. at 426) (Obermeier Cross).  The Transervice and Zenith Logistics employees at the KDC were represented by the General Drivers, Warehousemen & Helpers, Local Union No. 89 ("Local 89" or "Union").  *Id.* at 2 (Board Dec. at 2).

### 2. Union Organizing

In June 2019, drivers at Quickway's Louisville terminal began to organize with Local 89.  Joint App'x at 229 (Hr'g Tr. at 161) (Trafford Direct).[2]  At the time, drivers at four of Quickway's other terminals were represented by separate Teamsters' local unions.  *See id.* at 2 (Board Dec. at 2 n.7).  During the same period, drivers at Quickway's Indianapolis terminal were organizing with Teamster's Local 135; the Indianapolis union campaign ended when Indianapolis drivers voted against unionization in fall 2019.  *Id.* at 6 (Board Dec. at 6 n.21).

In July 2019, Kerry Evola, Quickway's Louisville Operations Manager, informed Chris Higgins, Quickway's Terminal Manager, that Louisville employees had approached him about the Union.  *Id.* at 2 (Board Dec. at 2).  That same month, Evola told pro-union Quickway drivers that "[i]f this place goes union, Bill Prevost will shut it down.  He's not going to have another terminal go to the union."  *Id.* at 237 (Hr'g Tr. at 177) (Tooley Direct).  Bill Prevost was the Chairman of Paladin's Board of Directors and CEO of both Paladin and Quickway.  *Id.* at 2 (Board Dec. at 2).

In August, Ed Marcellino, Quickway's Vice President of Operations, asked employee Donald Hendricks about the union campaign and requested a list of employees involved in union

---

[1]Obermeier was Kroger's Vice President of Supply Chain Operations.  *See* Joint App'x at 6 (Board Dec. at 6 n.20).

[2]Trafford was Local 89's lead organizer at the Quickway Louisville terminal.  *See* Joint App'x at 38 (Board Dec. at 38).

organizing.  *Id.* at 264–65 (Hr'g Tr. at 208–09) (Hendricks Direct).  That same month, Chris Cannon, the Quickway Group's Vice President of Operations, sent an email to other Paladin affiliate officials flagging that they needed to discuss the "union chatter within our driver ranks" in Louisville.  *Id.* at 3 (Board Dec. at 3).

In the fall of 2019, Higgins warned a Louisville driver that, if the Louisville terminal unionized, Quickway "would have to raise its prices and would probably lose its contract with Kroger, which would probably result in all employees at the terminal losing their jobs."  *Id.*; *see also id.* at 239–40 (Hr'g Tr. at 179–80) (Tooley Direct) (stating that Higgins "brought that to [him] several times").[3]  In October, Cannon again emailed other Quickway officials about the need to quickly address the "union talk in [the] Louisville terminal."  *Id.* at 2496 (Cannon Email).

On January 22, 2020, Local 89 informed Quickway that a majority of Louisville drivers had signed union authorization cards and requested voluntary recognition of the Union.  *Id.* at 230–31 (Hr'g Tr. at 162–63) (Trafford Direct).  Quickway declined to voluntarily recognize the Union; the Union then filed an election petition with the Board and a Board election was scheduled for May.  *Id.* at 3 (Board Dec. at 3).

Two days after the Union requested recognition, Evola told four Louisville drivers that Quickway would stop contributing to their Quickway stock accounts "the day . . . this comes union."  *Id.* at 2477–79 (Audio Recording Tr.).  One of the drivers filed an unfair labor practice charge, alleging that Evola's statement was a threat of retaliation in violation of the Act.  *See id.* at 3 (Board Dec. at 3 n.10).  Evola later approached the driver about the charge, stating that because the driver "went to the Labor Board about it," he'd better "make sure [he's] got an attorney, because I'm coming back."  *Id.*  Less than two weeks after the Union requested recognition, Higgins sent photographs of drivers' personal vehicles with Local 89 signs to Quickway officials, including Cannon.  *See id.* at 2506–11 (Higgins Email).  In March, after the Union had filed an election petition but before the election took place, Cannon and Prevost hired

---

[3]Tooley was a driver at the Louisville terminal.  *See* Joint App'x at 22 (Board Dec. at 22).

consultants they referred to as "union busters," to "help keep our Louisville terminal non-union." *Id.* at 1642 (Cannon Email).

Louisville drivers' representation election took place as a mail-ballot election between May 22 and June 19, 2020. *Id.* at 3 (Board Dec. at 3). On May 28, Cannon ordered the Louisville and Murfreesboro terminals to "disconnect any and all Murfreesboro drivers from picking up loads from the KDC," because "[a]ny Murfreesboro driver that comes on the lot at the KDC is being approached by the union, and we certainly do not want the union to infect our Murfreesboro fleet." *Id.* at 2536 (Cannon Email). On June 8, Cannon followed up to confirm that Murfreesboro drivers were no longer going to the KDC. *See id.* at 2541 (Cannon Email).

Quickway Louisville drivers voted to be represented by Local 89. *Id.* at 2649 (Ballot Tally). Following the election, Quickway officials quickly began discussing strategies to avoid any future picketing at the KDC; Prevost suggested that Quickway "could ask Kroger to have the loads assigned to [Quickway] shuttled from the KDC to the Louisville terminal by a different carrier or a towing company to prevent the Union from picketing at the KDC." *Id.* at 3 (Board Dec. at 3); *see id.* at 2548 (Prevost Email).

In August 2020, following the Louisville election but before bargaining began, the "union buster[]" that Quickway previously hired emailed Cannon. *Id.* at 1642, 2555 (Cannon Emails). The email alerted Cannon that almost one year had passed since the Indianapolis terminal voted against unionization, and reminded him that the Indianapolis terminal could again start organizing. *Id.* at 2555 (Cannon Email). Cannon sent the email to Paladin's HR Director and asked if they were "[i]nterested in their services?" *Id.* The HR Director declined, noting that they were not "impressed with them in Louisville." *Id.* A few weeks later, on September 16, former Quickway employee Hendricks told Cannon that the Union "is coming for Hebron!", i.e., Quickway's Hebron terminal. *Id.* at 2558 (Hendricks Email). Another Quickway official reacted to Hendricks's statement by saying that Hendricks "needs a cease and desist order sent or we will sue him for threatening to harm our business." *Id.* (Campbell Email).

On September 18, 2020, the Union held an action in front of the Louisville terminal; the Union "spoke with drivers as they entered and exited the terminal, handed out union shirts and

informational packets[,] . . . and solicited signatures from drivers who were not already union members." *Id.* at 4 (Board Dec. at 4). The new Louisville Terminal Manager, Jeff McCurry, informed Cannon about the action. *Id.* Cannon directed McCurry to "photograph any future union activity at the terminal . . . and document any feedback that he received from the drivers regarding what the Union was discussing with them that day." *Id.*

Quickway and the Union met for their first bargaining session on November 19; they exchanged initial proposals and reached tentative agreement on multiple provisions. *Id.* The parties did not discuss economic issues like wages or benefits. *Id.* at 1057 (Hr'g Tr. at 1745) (Cannon Direct). Though economic issues were not formally discussed, Union president Fred Zuckerman did state that "the Union was adamant about maintaining area standards at the KDC." *Id.* at 4 (Board Dec. at 4); *see also id.* at 421 (Hr'g Tr. at 501) (Zuckerman Direct). "Area standards" refers to the standards set out in the Union's contracts with other employers at the KDC. *Id.* at 4 (Board Dec. at 4). Zuckerman was thus indicating that the Union would not offer lower wages for its drivers to Quickway than it accepted from Transervice. *See id.* The parties agreed to meet for a second bargaining session on December 10. *Id.* at 1057 (Hr'g Tr. at 1745) (Cannon Direct).

### 3. Events of December 2020

On December 6, 2020, the Union held a strike-authorization meeting and Quickway Louisville drivers voted to authorize a strike if the Union deemed it necessary. Joint App'x at 4 (Board Dec. at 4). That same day, former Quickway employee Hendricks—who was not present at the strike-authorization meeting because he was no longer an employee or member of the bargaining unit—emailed at least two television stations about the possibility of a strike. *Id.* at 518–21 (Hr'g Tr. at 713–16) (Hendricks Direct). One of Hendricks's emails to the media stated that Quickway "has not negotiated in good faith and today a strike authorization was held with a unanimous decision of drivers present to strike on December 10th, 2020 if the company does not concede to the drivers negotiation[] efforts." *Id.* at 1590 (Media Email). The email further asserted that, "[a]t the conclusion of [the December 10 bargaining session,] if company officials refuse to ratify a contract Quickway Carrier Truck Drivers in Louisville will strike," and that "the Teamsters Local 89 Truck Drivers and Warehousemen who work for Transervice and

Zenith Logistics . . . will also strike in support of Quickway" drivers. *Id.* Finally, the email asserted that such a strike would shut down the KDC in its entirety. *Id.* At the time, the television stations could not confirm if the email-sender was involved with the Union. *Id.*

On December 7, Kroger informed Quickway that it had received inquiries from two Louisville television stations about a possible strike. *Id.* at 4–5 (Board Dec. at 4–5). Quickway and Kroger began discussing possible ways to mitigate any damage from a strike, including possibly setting up a reserved gate at the KDC just for Quickway drivers, thus preventing a KDC-wide shut-down. *Id.* at 913–15 (Hr'g Tr. at 1505–07) (Campbell Direct). Quickway ultimately determined that a reserved gate would not be effective because the Union's collective bargaining agreements with Transervice and Zenith protected those workers' right to refuse to cross Quickway's picket line. *Id.* at 4–5 (Board Dec. at 4–5). Quickway did not discuss any alternative mitigation efforts. At no point did Quickway contact Local 89 about the media inquiries. *See id.*

The next day, Quickway officials met to discuss the liability it could face if its Louisville drivers went on strike and shut down the KDC. *Id.* at 5 (Board Dec. at 5). Quickway believed that, under the KDC agreement, it could be held responsible by Kroger for the cost of hiring replacement workers, hiring replacement workers for Transervice and Zenith employees who honored the Quickway drivers' strike, and spoiled cargo. *Id.* On that basis, Quickway estimated that a strike and subsequent shut-down of the KDC would open Quickway up to liability in the amount of $2–4 million the first day of the strike and more than $1 million every day thereafter. *Id.* Such potential liability would quickly exceed Quickway's liquidity, exceed its line of credit, and potentially bankrupt both Quickway and Paladin as a whole. *Id.*

Quickway determined that the only way to prevent a KDC shut-down and protect itself from this potentially ruinous economic situation was to terminate its contract with Kroger and cease operations in Louisville. *Id.*; *id.* at 835–37 (Hr'g Tr. at 1347–49) (Prevost Direct). On December 9, Quickway resigned from the KDC agreement, effective as of 11:00 p.m. that day. *Id.* at 5–6 (Board Dec. at 5–6).

At approximately 1:00 p.m. on December 9, Cannon informed the Louisville terminal manager that the terminal would cease operations at 11:00 p.m. that night. *Id.* at 647 (Hr'g Tr. at 1026) (McCurry Direct). Between 1:00 p.m. and 11:00 p.m., Quickway removed its equipment from the KDC. *Id.* at 649 (Hr'g Tr. at 1029) (McCurry Direct). At 9:56 p.m., Quickway informed the Union that it was closing the Louisville terminal. *Id.* at 2689–91 (Oesterle Email).[4] At 11:00 p.m., Quickway notified Louisville employees of the cessation of operations and directed them not to report for work. *Id.* at 652–53 (Hr'g Tr. at 1032–33) (McCurry Direct). All Louisville terminal drivers, including the Louisville drivers temporarily assigned to the Hebron terminal, were laid off. *Id.* at 2707–08 (Oesterle Letter); *see also id.* at 448–49 (Hr'g Tr. at 540–41) (Trafford Direct).

The next day, Quickway sent drivers from its Indianapolis terminal to both the KDC and to a Louisville parking lot leased by Kroger to remove remaining equipment. *Id.* at 6 (Board Dec. at 6). The Indianapolis drivers assigned to the parking lot for equipment removal were greeted by the Louisville drivers' picket line. *Id.* After one Indianapolis driver, Johnston, who was assigned to collect equipment at the KDC, noticed that there were no Louisville drivers present, he called a Louisville driver; the Louisville driver shared that Quickway had ceased operations at the Louisville terminal. *Id.* at 464–66 (Hr'g Tr. at 581–83) (Johnston Direct). Johnston, who was part of a renewed organizing campaign at the Indianapolis terminal, informed other Indianapolis drivers; they responded that "[t]here goes our campaign." *Id.* at 466–68 (Hr'g Tr. at 583–85) (Johnston Direct). From that point forward, only one Indianapolis driver was willing to speak with the Teamsters organizer. *Id.* at 486 (Hr'g Tr. at 618) (Roach Direct).[5]

On the morning of December 10, Quickway and Local 89 met for their previously scheduled bargaining session. *Id.* at 6 (Board Dec. at 6). Quickway informed Local 89 that it was willing to bargain over the effects of its decision to cease operations at the Louisville terminal; Local 89, however, insisted on continuing negotiations over a collective bargaining agreement and declined to discuss effects of the closure. *Id.* at 1126–29 (Hr'g Tr. at 1828–31)

---

[4]Oesterle is Quickway's attorney. *See* Joint App'x at 36 (Board Dec. at 36).

[5]Roach was a Teamsters Local 135 organizer involved in the organizing campaign at the Indianapolis terminal. *See* Joint App'x at 6 (Board Dec. at 6).

(Cannon Direct).  Thereafter, Quickway again offered to bargain over the effects of its closure by letter on December 11.  *Id.* at 2707–08 (Oesterle Letter).  The parties had no further bargaining sessions.  *Id.* at 6 (Board Dec. at 6).

Following the closure of its Louisville terminal, Quickway returned the terminal's 44 rented trucks to Capital City Leasing, another Paladin affiliate.  *Id.*  Capital City Leasing sold four of the trucks and transferred the rest to other Quickway terminals or Paladin affiliates.  *Id.*  In 2021, Quickway subleased out the Louisville terminal for the remainder of the lease.  *Id.*

**C.  Procedural History**

Both before and after the representation election, several Louisville drivers and Local 89 filed unfair labor practice charges against Quickway, documenting many of the above-referenced facts.  *See* Joint App'x at 4 (Board Dec. at 4).  In September 2020, the Board approved informal settlement agreements ("September settlement agreements") between the drivers and Quickway, disposing of many of the charges.  *Id.*  In May 2021, the General Counsel of the National Labor Relations Board issued a consolidated complaint against Quickway.  *Id.* at 50 (ALJ Dec. at 1). The consolidated complaint alleged, in relevant part, that Quickway violated (1) Section 8(a)(3) and (1) of the Act by ceasing operations and discharging Louisville employees; (2) Section 8(a)(5) and (1) by failing to bargain over the decision to cease operations and the effects of that decision; and (3) Section 8(a)(1) and (4) by threatening, interrogating, and retaliating against employees because of their union activity.  *See id.* at 26 (Board Dec. at 26).  The complaint set aside the September settlement agreements based on Quickway's alleged subsequent violations of the Act.  *Id.* at 50 (ALJ Dec. at 1).

In August 2023, following an Administrative Law Judge hearing, decision, and subsequent appeal to the Board, a three-member panel of the Board issued a divided decision and order holding, in relevant part, that:  Quickway violated Section 8(a)(1), (3), (4), and (5) of the Act when it ceased operations at the Louisville terminal and discharged all the employees, failed to provide the Union notice and an opportunity to bargain over that decision and its effects, conducted threatening and coercive interrogations, and retaliated against an employee for filing an unfair labor practice charge.  *Id.* at 26 (Board Dec. at 26).

In its remedial order, the Board ordered Quickway to cease and desist from the enumerated violations and "to take certain affirmative action designed to effectuate the policies of the Act." *Id.* Specifically, the Board ordered Quickway to "reopen and restore its business operations at the Louisville terminal as they existed on December 9, 2020," and "[r]ecognize and, on request, bargain with" Local 89. *Id.* at 32 (Board Dec. at 32). Additionally, Quickway must offer reinstatement to all unlawfully discharged employees, "to the extent that their services are needed at the Louisville terminal to perform the work that [Quickway] is able to attract and retain from The Kroger Company or new customers after a good-faith effort." *Id.* If there are remaining discharged employees, Quickway must offer "reinstatement to any positions in its existing operations that they are capable of filling, with appropriate moving expenses." *Id.* Furthermore, the Board ordered Quickway to make the unlawfully discharged employees whole for their loss of earnings and benefits, "and for any other direct or foreseeable pecuniary harms suffered as a result of the discrimination against them." *Id.* The Board also ordered Quickway to "[c]ompensate affected employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards." *Id.* The Board noted that, "[a]t the compliance stage of these proceedings, [Quickway] will have the opportunity to introduce evidence that was not available at the time of the unfair labor practice hearing to demonstrate that this restoration order would be unduly burdensome." *Id.* at 28 (Board Dec. at 28 n.68).

## II. ANALYSIS

### A. Standard of Review

Our review of Board decisions "is quite limited." *Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 542 (6th Cir. 2016) (quoting *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 905 (6th Cir. 1997)). We review the Board's factual findings for substantial evidence and thus "uphold the NLRB's factual determinations if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if we may have reached a different conclusion had the matter been before us de novo." *Charter Commc'ns, Inc. v. NLRB*, 939 F.3d 798, 809 (6th Cir. 2019) (quoting *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 560 (6th Cir. 2019)). The "application of law to the facts is also reviewed for substantial evidence." *Caterpillar*, 835 F.3d at 542. The Board additionally has "broad discretion in fashioning

remedies for violations of the Act," *NLRB v. ADT Sec. Servs., Inc.*, 689 F.3d 628, 635 (6th Cir. 2012), and we review remedial orders only for abuse of discretion, *Compuware Corp. v. NLRB*, 134 F.3d 1285, 1291 (6th Cir. 1998).

## B.  Partial Cessation of Operations

The Board held that Quickway violated Section 8(a)(3) and (1) of the Act when it ceased operations at the Louisville terminal and discharged all employees.  Joint App'x at 26 (Board Dec. at 26).  The Board explained that Quickway (1) ceased operations at the Louisville terminal because of anti-union animus; (2) was motivated by a desire to chill unionism at other Quickway terminals; and (3) reasonably foresaw such chilling effect.  *See id.* at 8–17 (Board Dec. at 8–17).

Quickway argues that its decision "was motivated solely by the economic and financial risks and reasons stated, and not by a purpose to chill union activity at other terminals."  D. 35 (Quickway Br. at 46).  Quickway argues that there is no substantial evidence to support the conclusion that it was motivated by anti-union animus or by a desire to chill unionism.  *Id.* at 46–51.  Likewise, Quickway argues that there is no substantial evidence to show that any such chill was reasonably foreseeable because "[t]he only purported evidence the [Board] references is the hearsay testimony of an Indianapolis driver *who the ALJ found to be not credible*."  *Id.* at 51.

The Supreme Court has repeatedly stated that "an employer has the right to terminate his business."  *Textile Workers Union of Am. v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965).  On that basis, if "an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice."  *Id.* at 274.  Stated otherwise, an employer can close-up shop, even for anti-union reasons, without running afoul of the NLRA.

A partial cessation of operations, on the other hand, is only sometimes permitted by the NLRA.  An employer is free partially to cease operations for purely economic reasons without violating the Act.  *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 686 (1981).  If an employer partially closes a business out of anti-union animus, however, that "discriminatory partial closing may have repercussions on what remains of the business, affording employer leverage for discouraging the free exercise of §7 rights among remaining employees."  *Darlington*, 380 U.S.

at 274–75.  Because partial closings may affect other employees' rights under the NLRA, the Supreme Court has established a test for determining when a partial closing violates the Act:

> If the persons exercising control over a plant that is being closed for antiunion reasons (1) have an interest in another business, whether or not affiliated with or engaged in the same line of commercial activity as the closed plant, of sufficient substantiality to give promise of their reaping a benefit from the discouragement of unionization in that business; (2) act to close their plant with the purpose of producing such a result; and (3) occupy a relationship to the other business which makes it realistically foreseeable that its employees will fear that such business will also be closed down if they persist in organizational activities, we think that an unfair labor practice has been made out.

*Id.* at 275–76.  It is undisputed that Quickway had interests in other businesses sufficient to satisfy element one of the *Darlington* test.  *See* D. 35 (Quickway Br. at 46–51); D. 45 (NLRB Br. at 25).  As to the remaining elements, when an employer partially closes its business for anti-union reasons, that "partial closing is an unfair labor practice under § 8(a)(3) if motivated by a purpose to chill unionism . . . and if the employer may reasonably have foreseen that such closing would likely have that effect."  *Darlington*, 380 U.S. at 275.

### 1.  Anti-Union Animus

As the Board explained, the "threshold element" of the *Darlington* test is "that the employer closed the relevant part of its business for antiunion reasons."  Joint App'x at 8 (Board Dec. at 8); *see also Purolator Armored, Inc. v. NLRB*, 764 F.2d 1423, 1429 (11th Cir. 1985). When determining whether an employer acted out of anti-union animus, the Board may consider both direct and circumstantial evidence.  *Charter Commc'ns*, 939 F.3d at 815.  "Circumstantial evidence inviting an inference of animus includes, among other examples, 'the company's expressed hostility towards unionization combined with knowledge of the employees' union activities' and 'proximity in time between the employees' union activities and their discharge.'" *Id.* (quoting *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 778 (6th Cir. 2002)); *see also Purolator*, 764 F.2d at 1429 (noting that "timing of decision, presence of other unfair labor practices, and lack of attempt to solve problems without termination are considered in finding anti-union motivation in violation of section 8(a)(3)" (citing *NLRB v. Big Three Indus. Gas & Equip. Co.*, 579 F.2d 304, 315 (5th Cir. 1978))).

The Board relied on Quickway's expressed hostility towards the Union, the proximity in time between bargaining and the partial closure, the presence of other unfair labor practices, and Quickway's failure to consider alternatives other than closure in determining that Quickway closed the Louisville terminal out of anti-union animus.  The Board explained that, before the representation election, Quickway "subjected employees to numerous instances of coercive conduct in response to the Union's organizing campaign at the Louisville terminal," and "coercively interrogated drivers about their union activities," following the election.  Joint App'x at 8 (Board Dec. at 8).  Quickway officials were expressly hostile to the Union, warning drivers that they may lose their jobs if the Louisville terminal unionized.  *See id.* at 237–40 (Hr'g Tr. at 177–80) (Tooley Direct).  Quickway also surveilled employees' union activity by photographing their personal vehicles with Local 89 signs.  *Id.* at 2506–11 (Higgins Email).  "Creating an impression of surveillance," or actually surveilling employees' union activity, demonstrates anti-union animus because it insinuates that "'members of management are peering over [employees'] shoulders, taking note of who is involved in union activities, and in what particular ways.'"  *Charter Commc'ns*, 939 F.3d at 811–12 (quoting *Caterpillar*, 835 F.3d at 544).

"[T]he timing of [Quickway's] decision to cease operations at the Louisville terminal, which occurred only a few weeks after the parties' first bargaining session," further indicated anti-union animus.  Joint App'x at 9 (Board Dec. at 9).  The Board explained that the quick turnaround between the beginning of bargaining and the decision partially to cease operations, combined with Quickway officials' statements opposed to the Union and opposed to its bargaining position "support a finding that [Quickway's] decision was made to avoid bargaining with the Union and was thus discriminatorily motivated."  *Id.*

As discussed below, much of Quickway's conduct violated the Act.  *See infra* Part II, Section D.  An employer's unfair labor practices "demonstrate that [an employer] was staunchly opposed to unionization of its employees and was willing to commit a variety of unlawful acts to defeat the Union."  *Purolator*, 764 F.2d at 1429.  Unfair labor practices thus may "form the background of our evaluation of the alleged section 8(a)(3) violation."  *Id.*

Quickway's "lack of attempt to solve" the potential strike problem "without termination" is also evidence of its anti-union motivation.  *Purolator*, 764 F.2d at 1429 (citing *Big Three*, 579

F.2d at 315). Following the media inquiries about a possible strike, Quickway considered setting up a reserved gate at the KDC to prevent a KDC-wide shut-down. Joint App'x at 913–15 (Hr'g Tr. at 1505–07) (Campbell Direct). After determining that a reserved gate would not work, Quickway failed to consider any other solutions, failing even to consider a third-party shuttle system that might "prevent the Union from picketing at the KDC," as Quickway officials had discussed mere months prior. *Id.* at 3 (Board Dec. at 3); *see id.* at 2548 (Prevost Email). Stated otherwise, Quickway had previously discussed mitigation efforts in the case of a strike, yet, when the potential arose in December 2020, Quickway did not consider those possibilities, and instead turned to termination. And, despite the anonymity of the media tips, Quickway did not investigate the threats or reach out to the Union to inquire about a possible strike. *See id.* at 4–5 (Board Dec. at 4–5). That "'failure to conduct a meaningful investigation' into allegations leading to discharge may give rise to an inference that anti-union sentiment was the true cause of the employer's actions." *Charter Commc'ns*, 939 F.3d at 817 (quoting *Airgas*, 916 F.3d at 563)).

"[A]nti-union animus need not be the employer's sole motivation in a case of partial closing." *Elec. Prods. Div. of Midland-Ross Corp. v. NLRB*, 617 F.2d 977, 986 (3d Cir. 1980). That Quickway may have *also* been concerned about the economic risks of a strike does not undermine Quickway's anti-union motivation. *See id.* The Board, agreeing with the ALJ, found that "the possible strike raised in the media inquiries 'presented [Quickway] with the opportunity to do what it preferred to do in any event[:] withdraw its recognition of the Union, terminate its contract with Kroger and lay-off all of its Louisville drivers." Joint App'x at 10 (Board Dec. at 10) (second alteration in original). The Board's conclusion that Quickway was motivated by anti-union animus is supported by substantial evidence.

### 2. Purpose to Chill Unionization

In evaluating whether an employer had a purpose to chill unionization when it partially closed its business, courts consider "fair inferences arising from the totality of the evidence, considered in the light of then-existing circumstances." *Darlington Mfg. Co.*, 165 NLRB 1074, 1083 (1967). A motivation to chill unionization "may be proved by something less than direct evidence, rarely available in cases of this kind." *Id.* Courts consider "contemporaneous union activity at the employer's remaining facilities, geographic proximity of the employer's facilities

to the closed operation, the likelihood that employees will learn of the circumstances surrounding the employer's unlawful conduct through employee interchange or contact, and, of course, representations made by the employer's officials and supervisors to the other employees." *San Luis Trucking, Inc.*, 352 NLRB 211, 236 (2008) (quoting *Bruce Duncan Co.*, 233 NLRB 1243, 1243 (1977)). A showing of anti-union animus as a motivating factor does not "*ipso facto* prove[]" that chilling unionization was likewise a motivating factor. *Darlington Mfg. Co.*, 165 NLRB at 1083. That said, "the existence of one motive may indicate a disposition toward another." *Id.*

In *Purolator Armored, Inc. v. NLRB*, the Eleventh Circuit held that the employer was motivated by a purpose to chill unionization when it closed a division of its company. 764 F.2d at 1431. The court noted that terminated and non-terminated employees worked in the same building, "there was evidence of daily interaction between" the two groups, the same union represented the terminated and non-terminated employees, and "both groups were under the same managerial structure." *Id.* at 1430. Likewise, in *George Lithograph Co.*, the Board held that an employer had a purpose to chill unionization when it closed one division of its business that was located in the same building as, and was under the same management as, other divisions. 204 NLRB 431, 431–32 (1973). The Board explained that, "[g]iven the proximity of the [closed] division and [the employer's] other business operations, as well as the frequency and vehemence with which [the employer] announced its opposition to the . . . Union, we may reasonably infer and find that" the employer intended to chill unionization in other divisions of its business. *Id.*

Here, as in *Purolator* and *George Lithograph*, there was close proximity between the terminated Louisville drivers and Quickway's other drivers. Though not based in the same building, Quickway drivers from the Murfreesboro and Indianapolis terminals were assigned routes that brought them to the KDC and Louisville terminal. Joint App'x at 299–302 (Hr'g Tr. at 292–95) (Cannon Direct). Given the nature of their jobs—driving and delivering bulk groceries—shared destinations at which drivers stop to load trucks are akin to shared buildings in more stationary professions. Even more on point, the terminated Louisville drivers assigned to the Hebron terminal worked consistently under the same roof as non-terminated employees. *See*

*id.* at 448–49 (Hr'g Tr. at 540–41) (Trafford Direct).  Furthermore, Quickway management at the center of this case—Cannon, for example—held direct decisionmaking power and managerial authority over multiple terminals.  *See id.* at 2536 (Cannon Email) (directing activity at both the Louisville and Murfreesboro terminals).  The management of the terminated and non-terminated drivers was, accordingly, intermingled.

Quickway, additionally, expressly stated its concern about the union activity in Louisville "infect[ing]" other terminals.  *Id.*  During the Louisville drivers' representation election, just a few months prior to the closure of the Louisville terminal, Cannon ordered the Louisville and Murfreesboro terminals to "disconnect any and all Murfreesboro drivers from picking up loads from the KDC," because "[a]ny Murfreesboro driver that comes on the lot at the KDC is being approached by the union, and we certainly do not want the union to infect our Murfreesboro fleet."  *Id.*  Additionally, in August 2020, Cannon was alerted to the possibility of the Indianapolis terminal renewing a union campaign; Cannon asked Paladin's HR Director if they were interested in the services of "union busters."  *Id.* at 1642, 2555 (Cannon Emails).  Later that fall, Quickway employee Hendricks announced that the Union "is coming for Hebron!," i.e., Quickway's Hebron terminal, and Campbell insinuated that he considered the announcement a "threat[] to harm our business."  *Id.* at 2558 (Hendricks & Campbell Emails).  Considering the evidence as a whole, there is substantial evidence to support the Board's conclusion that, in closing the Louisville terminal, Quickway was motivated by a desire to chill unionization at its other terminals.

### 3.  Chill is Reasonably Foreseeable

The final inquiry under *Darlington* is whether a chilling effect was reasonably foreseeable.  *See* 380 U.S. at 275.  Intent to chill and the foreseeability of a chilling effect are closely related; an employer "is held to intend the foreseeable consequences of [its] conduct." *NLRB v. Tenn. Packers, Inc.*, 339 F.2d 203, 205 (6th Cir. 1964) (quoting *Radio Officers' Union v. NLRB*, 347 U.S. 17, 45 (1954)).  In *Purolator Armored, Inc. v. NLRB*, the court explained that it is reasonably foreseeable that closing one part of a business out of anti-union animus will chill unionization in other parts of that business if there is close "proximity between terminated and non-terminated employees."  764 F.2d at 1430; *see also George Lithograph*, 204 NLRB at 431–

32. Likewise, if non-terminated employees are forced to cross a picket line and see, first-hand, the effects of the union activity, it is reasonably foreseeable that the closure will chill union activity among the non-terminated employees. *See Plastics Transp., Inc.*, 193 NLRB 54, 58 (1971).

Here, non-terminated Murfreesboro and Indianapolis drivers had regularly worked at the KDC with now-terminated Louisville drivers. *See* Joint App'x at 299 (Hr'g Tr. at 292) (Cannon Direct). At least one terminated Louisville driver, moreover, was assigned to the Hebron terminal at the time of the partial closure; that terminated driver had been working side-by-side with non-terminated drivers and then simply did not show up for work. *See id.* at 301–02 (Hr'g Tr. at 294–95) (Cannon Direct); *id.* at 448–49 (Hr'g Tr. at 540–41) (Trafford Direct).

Like the non-terminated workers in *Plastics Transportation*, non-terminated Quickway drivers were "brought down to cross the picket line and remove the equipment" the day after the closure. 193 NLRB at 58. In order to remove remaining equipment from the Louisville parking lot leased by Kroger, Quickway Indianapolis drivers were forced to cross the Louisville drivers' picket line. *See* Joint App'x at 6 (Board Dec. at 6). Other Quickway Indianapolis drivers were sent to the KDC to collect equipment; they immediately noticed that there were no Louisville drivers present and began inquiring about what happened. *Id.* at 464–66 (Hr'g Tr. at 581–83) (Johnston Direct). By closing the Louisville terminal and then bringing non-terminated employees to the site of the closure to witness it firsthand, it was reasonably foreseeable that the closure would chill other Quickway employees' unionization efforts. *See Plastics Transp.*, 193 NLRB at 58.

Reasonable foreseeability of a chilling effect does not require evidence of actual chilling. *See George Lithograph*, 204 NLRB at 431. Evidence of actual chilling, however, tends to buttress the conclusion that a chilling effect was reasonably foreseeable. Here, after the non-terminated Quickway Indianapolis drivers cleared out the equipment in Louisville, they asserted that "[t]here goes our campaign." Joint App'x at 467, 468 (Hr'g Tr. at 584, 585) (Johnston

Direct).**6**  Though the Indianapolis drivers had been actively organizing, seeing the Louisville closure chilled their efforts; after seeing the Louisville closure, only one Indianapolis driver was willing to speak with the Teamsters organizer that they had previously been working with.  *Id.* at 486 (Hr'g Tr. at 618) (Roach Direct).  This evidence of chill strengthens the conclusion that chill was reasonably foreseeable.

Because there is substantial evidence to support the Board's conclusions that Quickway partially ceased operations out of anti-union animus, intended to chill unionization at its remaining terminals, and that such an effect was reasonably foreseeable, there is substantial evidence to support the conclusion that Quickway violated Section 8(a)(3) and (1) of the Act by ceasing operations at the Louisville terminal.

**C.  Failure to Bargain**

The Board next held that Quickway violated Section 8(a)(5) and (1) of the Act by failing to bargain over its decision to cease operations at the Louisville terminal and the effects of that decision.  Joint App'x at 26 (Board Dec. at 26).

### 1.  Partial Cessation of Operations

Quickway argues that its closure of the Louisville terminal was an "entrepreneurial decision to cease operations," and thus "not subject to a bargaining obligation under the Supreme Court's *First National Maintenance* decision and its progeny."  D. 35 (Quickway Br. at 34).  In *First National Maintenance Corporation v. NLRB*, the Supreme Court held that an employer's decision "to shut down part of its business purely for economic reasons . . . is *not* part of § 8(d)'s 'terms and conditions,'" and thus is not a mandatory subject of bargaining under the NLRA.  452 U.S. at 686.  Though a decision partially to cease business operations for purely economic reasons is not a mandatory subject of bargaining, "[a]n employer may not simply shut down part of its business and mask its desire to weaken and circumvent the union by labeling its decision 'purely economic.'"  *Id.* at 682.

---

**6**Quickway argues that the ALJ found Johnston not to be credible.  *See* D. 35 (Quickway Br. at 51).  In fact, the ALJ discredited Johnston's testimony only as to whether he discussed the Indianapolis organizing campaign with a manager.  Joint App'x at 55 (ALJ Dec. at 6).  An ALJ however, "can credit parts of a given witness's testimony, while discrediting other parts."  *NLRB v. Norbar, Inc.*, 752 F.2d 235, 240 (6th Cir. 1985).

*First National*, moreover, is limited to partial closures taken *purely* for economic reasons. *See id.* at 686–87. "[A] partial closing decision that is motivated by an intent to harm a union," on the other hand, is outside *First National*'s reach. *Id.* at 682. A partial-closing decision motivated by anti-union animus is, accordingly, subject to an obligation to bargain. *See Delta Carbonate, Inc.*, 307 NLRB 118, 122 (1992) ("Where, as here, such a decision is motivated by antiunion reasons, an employer is not exempt from a bargaining obligation under *First National Maintenance*."); *NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1316 (7th Cir. 1998) ("[A] finding [of anti-union motivation] prevents the application of *First National Maintenance* and also sustains a finding that the company violated Section 8(a)(3)."); *cf. NLRB v. Gibraltar Indus., Inc.*, 653 F.2d 1091, 1096 (6th Cir. 1981) (holding that the *First National Maintenance* exception applies because "the record does not support the Board's finding that Gibraltar was motivated by anti-union animus when it closed its Olive Hill plant").

As discussed above, Quickway's decision to cease operations at its Louisville terminal was born out of anti-union animus. *See supra* Part II, Section B.1. Because that partial-closure decision was discriminatorily motivated in violation of Section 8(a)(3), Quickway's failure to bargain over that decision violated Section 8(a)(5). Quickway argues that its decision was motivated by economic necessity. *See, e.g.*, D. 35 (Quickway Br. at 36). That may be so. Even if Quickway were motivated by economic necessity, however, there is substantial evidence to support the Board's conclusion that it was also motivated by anti-union animus. *See supra* Part II, Section B.1. And "[d]iscrimination on the basis of union animus cannot constitute a lawful entrepreneurial decision." *Delta Carbonate*, 307 NLRB at 122.

### 2. Effects

Under Section 8(a)(5) of the Act, Quickway was also obligated to bargain with the Union over the effects of its decision partially to cease operations. *See First Nat'l*, 452 U.S. at 681–82. To meet its effects-bargaining obligation, an employer must bargain "in a meaningful manner and at a meaningful time." *Id.* at 682. "A concomitant element of 'meaningful' bargaining is timely notice to the union of the decision to close, so that good faith bargaining does not become futile or impossible." *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 26 (1st Cir. 1983); *see also NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1286 (7th Cir. 1989).

Here, on the morning of December 10, Quickway informed Local 89 that it was willing to bargain over the effects of its decision to close the Louisville terminal. Joint App'x at 1126–29 (Hr'g Tr. at 1828–31) (Cannon Direct). Local 89, however, insisted on continuing negotiations over a collective bargaining agreement and declined to discuss effects of the closure. *Id.* Quickway does not dispute that it had an obligation to bargain over the effects of its decision to close the Louisville terminal. *See* D. 35 (Quickway Br. at 45). Quickway simply argues that "effects bargaining was offered at a meaningful time and in a meaningful manner," and it was "[t]he Union's conduct and refusal to cooperate [that] thwarted Quickway's efforts." *Id.* at 46.

The Board held that Quickway failed to meet its effects-bargaining obligation despite its offer to bargain over the effects of the partial closure. Joint App'x at 21 (Board Dec. at 21 n.55). The Board explained that, "[w]here, as here, a union is entitled to bargain over both the decision and its effects, the employer must provide the union a prior or contemporaneous opportunity to bargain over the former to fully satisfy its obligation to bargain over the latter." *Id.* (quoting *DuPont Specialty Prods. USA, LLC*, 369 NLRB No. 117, slip op. at 18 (July 8, 2020)).

In *Dupont Specialty Products USA,* an employer unilaterally decided to subcontract bargaining unit work without bargaining with the union over its decision or the effects therein. 369 NLRB No. 117, slip op. at 18. The employer in *Dupont* "repeatedly offered and tried to" bargain over effects, "but . . . the Union refused." *Id.* Because the employer's "offer to bargain the effects was at all times made in the context of its unlawful refusal to bargain over the subcontracting decision," however, the Board held that the offers were "'insufficient to satisfy its [bargaining] obligations.'" *Id.* (quoting *Solutia, Inc.*, 357 NLRB 58, 65 (2011)). The employer's failure to bargain over effects violated Section 8(a)(5) and (1) of the Act. *Id.* at 19.

*Dupont* is directly on point. Quickway was obligated to bargain over its decision to cease operations at the Louisville terminal. *See supra* Part II, Section C.1. In order to satisfy its effects-bargaining obligation, Quickway must therefore bargain over both the decision and its effects. *DuPont Specialty*, 369 NLRB No. 117, slip op. at 18. "Given [Quickway's] unlawful failure to bargain over the [partial closure] decision, [Quickway] failed to satisfy its duty to bargain over the effects of that decision." *Id.* Just like in *Dupont*, no amount of offering to

bargain over the effects of a decision satisfies Quickway's obligation to bargain over both the decision itself and its effects.

**D.  Threats and Interrogations**

The Board found that Quickway violated the Act when (1) Evola threatened drivers that Quickway "would close the Louisville terminal if the drivers selected the Union as their collective-bargaining representative," Joint App'x at 21 (Board Dec. at 21); (2) "Marcellino instructed employee Hendricks to create a list of union supporters," *id.* at 22 (Board Dec. at 22); (3) Higgins told a Louisville driver "that if the terminal went union, [Quickway] would have to raise its prices and would probably lose its contract with Kroger, which would probably result in all employees at the terminal losing their jobs," *id.*; (4) Evola told Louisville drivers that Quickway "would no longer contribute new shares to the drivers' [stock] accounts if they selected the Union as their representative," *id.*; (5) Evola threatened to take legal action against a Louisville driver who filed an unfair labor practice charge with the Board, *id.* at 23 (Board Dec. at 23); and (6) McCurry interrogated Louisville drivers during the Union's job action, *id.* at 25 (Board Dec. at 25).  Quickway violated Section 8(a)(4) of the Act when it engaged in charge (5); the remaining charges fall under Section 8(a)(1).  *See id.* at 26 (Board Dec. at 26).

**1.  Charges Covered by the September Settlement Agreements**

Charges (1) through (5), above, were all covered by the September settlement agreements.  *See* Joint App'x at 21–24 (Board Dec. at 21–24).  Quickway argues that the Board erred when it found that the General Counsel was justified in setting aside the September settlement agreements.  D. 35 (Quickway Br. at 55).  According to Quickway, "[b]ecause Quickway's Decision and the closure were lawful under *First National Maintenance* and *Darlington*, the settlement agreements should be reinstated, and the settled Section 8(a)(1) and (4) allegations dismissed." *Id.*

Contrary to Quickway's argument, Quickway's decision to cease operations at the Louisville terminal and subsequent failure to bargain over that decision and its effects violated Section (8)(a)(1), (3), and (5) of the NLRA.  *See supra* Part II, Section B, C.  As the Board correctly noted, "a settlement agreement may be set aside and unfair labor practices found based

on presettlement conduct if there has been a failure to comply with the provisions of the settlement agreement or if post-settlement unfair labor practices are committed." Joint App'x at 21 (Board Dec. at 21) (quoting *Twin City Concrete*, 317 NLRB 1313, 1313 (1995)). Because there is substantial evidence to support the Board's findings that Quickway violated Section 8(a)(1), (3), and (5) of the Act when it partially ceased operations and failed to bargain, it was proper for the General Counsel to set aside the September settlement agreements.

"Quickway does not dispute any of the underlying facts or challenge the Board's findings that the conduct would violate Section 8(a)(1) but for the settlement" agreements. D. 45 (NLRB Br. at 48); *see* D. 35 (Quickway Br. at 55). We have previously explained that if an "employer fails to challenge a portion of the Board's findings on appeal, [we] may 'summarily enforce the Board's order with regard to those issues.'" *Vanguard Fire & Supply Co. v. NLRB*, 468 F.3d 952, 956 (6th Cir. 2006) (quoting *NLRB v. Talsol Corp.*, 155 F.3d 785, 793 (6th Cir. 1998)). Because the September settlement agreements were properly set aside, we summarily enforce the Board's order as it relates to the unfair labor practices covered by the September settlement agreements.

### 2. McCurry Interrogation

The last charge—that McCurry interrogated Louisville drivers during the Union's job action in violation of the Act, Joint App'x at 25 (Board Dec. at 25)—was not covered by the September settlement agreements. Quickway argues that the Board's "conclusion that McCurry's communications with drivers violated Section 8(a)(1) is not supported by substantial evidence" because there is no evidence "that any employee was threatened, coerced, or promised anything" by McCurry on the day of the Union's job action. D. 35 (Quickway Br. at 65).

In its decision, the Board stated that, "[d]uring the job action, Terminal Manager McCurry emailed a photograph of [the action] to Cannon . . ., noting that he was going to try to find out what the Union was discussing with the drivers." Joint App'x at 25 (Board Dec. at 25). "[L]ater that day, McCurry stated that all the drivers to whom he had spoken responded that they shut down the union representatives and were not interested in speaking to the Union." *Id.*

An employer violates Section 8(a)(1) "when substantial evidence demonstrates that the employer's [actions], considered from the employees' point of view, had a reasonable tendency to coerce." *Caterpillar*, 835 F.3d at 543 (alteration in original) (quoting *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005)). "A finding of 'actual coercion' is not required." *Id.* (quoting *Dayton Newspapers*, 402 F.3d at 659). "When assessing the coercive tendency of an interrogation, the [Board] looks at, among other things, the background, the nature of the information sought, the questioner's identity, and the place and method of interrogation." *Id.* (alteration in original) (quoting *Dayton Typographic Serv., Inc. v. NLRB*, 778 F.2d 1188, 1194 (6th Cir. 1985)).

Here, "McCurry was the highest-ranking management official at the Louisville terminal at that time," he "approached drivers while the job action was occurring and asked them about their discussions with the union representatives conducting the job action," and he did so "almost immediately" following those discussions. Joint App'x at 26 (Board Dec. at 26). From the employees' point of view, McCurry's role as the "highest-ranking onsite manager" increases the likelihood of a reasonable tendency to coerce. *Bannum Place of Saginaw, LLC*, 370 NLRB No. 117, 2021 WL 1751769, at *7 (Apr. 30, 2021), *enforced*, 41 F.4th 518 (6th Cir. 2022). Likewise, "the background of the exchange, in that" a union job action was ongoing and employees' "union support was private," further supports the Board's conclusion that McCurry's questioning "amounted to coercive interrogation in violation of the Act." *Caterpillar*, 835 F.3d at 543. McCurry himself stated that he was attempting to find out from drivers what Local 89 was "discussing with drivers." Joint App'x at 2563 (McCurry Email). McCurry also reported back to other management what the drivers thought of the union. *See id.* "[T]he nature of the information sought" was thus clearly related to the drivers' "position on the union." *Caterpillar*, 835 F.3d at 543. Based on this evidence together, "[t]he Board reasonably concluded that this encounter had a reasonable tendency to coerce." *Id.* There is substantial evidence to support the Board's conclusion that McCurry's interrogations violated Section 8(a)(1).

## E. Procedural Rulings

Quickway argues that the Board erred when it adopted the ALJ's determination that Obermeier was credible, D. 35 (Quickway Br. at 60); upheld the ALJ's revocation of subpoenas

and preclusion of certain testimony, *id.* at 61–62; failed "to require the General Counsel to produce exculpatory evidence," *id.* at 62; and rejected Quickway's affirmative defense that the Union was engaged in unlawful secondary conduct, *id.* at 64. Quickway's procedural arguments are meritless.

We will overturn a credibility determination only if the determination "overstep[s] the bounds of reason," *Caterpillar*, 835 F.3d at 542 (quoting *Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 366 (6th Cir. 1984) (per curiam)), or is "inherently unreasonable or self-contradictory," *id.* (quoting *Tel Data Corp. v. NLRB*, 90 F.3d 1195, 1199 (6th Cir. 1996)). Though Quickway calls the ALJ's determination of Obermeier's credibility "inherently unreasonable," it fails to demonstrate what was inherently unreasonable about that determination. D. 35 (Quickway Br. at 61). Quickway thus cannot overcome our deferential review of credibility determinations.

Quickway next argues that the Board erred in upholding the ALJ's revocation of subpoenas and exclusion of evidence. *Id.* at 61–62. The Board held that Quickway did "not show[] why the excluded evidence was relevant or how it was prejudiced by the exclusion of that evidence, nor has it alleged that the [ALJ's] evidentiary rulings demonstrate bias or prejudice against it." Joint App'x at 1 (Board Dec. at 1 n.1). We review evidentiary rulings for abuse of discretion, *NLRB v. Jackson Hosp. Corp.*, 557 F.3d 301, 306 (6th Cir. 2009); *cf. Veritas Health Servs., Inc. v. NLRB*, 895 F.3d 69, 78 (D.C. Cir. 2018), and reverse only when we are "firmly convinced that a mistake has been made," *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995). Quickway presents no evidence that firmly convinces us that a mistake has been made.

Quickway next asks this court to apply the principles of *Brady v. Maryland*, 373 U.S. 83 (1963), to administrative proceedings and hold that the Board erred by not requiring the General Counsel to produce exculpatory evidence. *See* D. 35 (Quickway Br. at 62–63). Quickway identifies no federal court that has imported the *Brady* standard to administrative proceedings. *Id.* In contrast, the Board notes that several of our sibling circuits "have rejected this argument as a misplaced analogy that would interfere with the Board's enforcement proceedings." D. 45 (NLRB Br. at 42) (listing cases). Quickway, moreover, fails to identify any exculpatory evidence that the General Counsel suppressed. *See* D. 35 (Quickway Br. at 63) (noting only that

"by not calling certain witnesses, . . . as the General Counsel did here, potential exculpatory evidence remains suppressed"). The Board, accordingly, did not abuse its discretion by failing to import a new rule that would require the General Counsel to produce this unnamed "potential exculpatory evidence." *Id.*

Finally, the Board did not abuse its discretion as it relates to Quickway's affirmative defense. The Board found "it unnecessary to pass on [Quickway's] argument" because, "[e]ven assuming the message contained in the media inquiries would have constituted an unprotected threat . . . the record evidence does not establish that [Quickway] had a reasonable belief that the Union was the source of the information in the media inquiries or that [Quickway] decided to cease operations at the Louisville terminal to avoid potentially catastrophic liability and damages that it feared could have resulted from a strike." Joint App'x at 14 (Board Dec. at 14 n.38). Stated otherwise, because the Board found that Quickway was motivated by anti-union animus and a desire to chill unionization, and not purely economic reasons, Quickway's affirmative defense would not save it. Because the Board's determination that Quickway was not motivated purely by economic reasons was supported by substantial evidence, *see supra* Part II, Section B, the Board's decision not to address this affirmative defense was not an abuse of discretion.

## F. Remedies

As noted, the Board has "broad discretion in fashioning remedies for violations of the Act." *ADT Sec. Servs.*, 689 F.3d at 635. "[T]he Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969). We will disturb the Board's remedial orders only when "it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *ADT Sec. Servs.*, 689 F.3d at 635 (quoting *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943)).

When an employer unlawfully closes a section of its business and discharges all employees in that section, the Board should issue an "order [that] as nearly as possible restore[s] the parties to the status quo which existed before the unfair practices occurred." *Decaturville*

*Sportswear Co. v. NLRB*, 406 F.2d 886, 889 (6th Cir. 1969); *see Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 215–17 (1964).  On that basis, "a restoration order 'typically is the appropriate remedy for a discriminatorily motivated change in operations.'"  *NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 516 (6th Cir. 1998) (quoting *Adair Standish Corp. v. NLRB*, 912 F.2d 854, 867 (6th Cir. 1990)); *see also Mid-South Bottling Co. v. NLRB*, 876 F.2d 458, 460–61 (5th Cir. 1989).

A restoration order is thus appropriate here, "unless the employer can show that such a remedy would be unduly burdensome."  *Int'l Shipping Agency, Inc.*, 369 NLRB No. 79, slip op. at 7 (May 20, 2020); *see also Fibreboard Paper*, 379 U.S. at 216.  It is the employer's burden to demonstrate that a restoration order is unduly burdensome, and "[t]he threshold to establishing its burden is high."  *Mid-South Bottling*, 876 F.2d at 461.

Quickway argues that the Board "erroneously found [that] the evidence did not establish restoration of the Louisville terminal operations would be unduly burdensome."  D. 35 (Quickway Br. at 57).  In support of its argument, Quickway notes that it "almost exclusively serviced Kroger out of its Louisville terminal" and its contract with Kroger was terminated, it "subleased the terminal after the termination of the" Kroger contract, it "would have to spend millions of dollars to restore the necessary equipment alone," and "[r]estoration would be unprofitable since [it] has no Louisville business and would likely result in an unsustainable financial burden."  *Id.* at 57–58.

In *Westchester Lace, Inc.*, an employer subcontracted the work at one of its facilities and laid off the employees at that facility.  326 NLRB 1227, 1227 (1998).  After finding that this violated Section 8(a)(3) and (1) of the Act, the Board ordered the employer to "[r]eestablish and resume" operations at the facility.  *Id.* at 1246.  The Board found that the employer "failed to meet its burden to establish that restoration is unduly economically burdensome."  *Id.* at 1245 (citation omitted).  There, the employer "still owned at close of hearing all equipment and machinery . . . necessary to reestablish its . . . operation," though most of the machinery was "in a disassembled state."  *Id.*  "[T]he cost of reassembling and [starting up] the operation was estimated by [the] owner . . . at $100,000 to $200,000."  *Id.*  And though the employer had since sold the facility, the ALJ and Board held that, because it was sold "at a time when [the employer]

was on notice from the complaint that closing was unlawful and General Counsel would seek its restoration, [the employer] should not be able to knowingly benefit from its unlawful conduct." *Id.*

Here, like in *Westchester Lace*, restoring operations may be costly. That said, like the employer in *Westchester Lace*, Quickway and its affiliates still own nearly all the equipment from the Louisville terminal. *See* Joint App'x at 6 (Board Dec. at 6) (explaining that Quickway and its affiliates still own 40 of the 44 trucks used at the Louisville terminal); *see also Mid-South Bottling*, 876 F.2d at 461 (upholding a restoration order where "much of the equipment was simply sent to other . . . [affiliated] facilities"). As the Board explained, Quickway "has not shown that it would be unduly burdensome for it to reacquire a sufficient number of trucks to restore its operations at the Louisville terminal." Joint App'x at 27 (Board Dec. at 27). Further, Quickway leased the Louisville terminal "at a time when [it] was on notice" that the General Counsel was seeking the restoration of the terminal. *Westchester Lace*, 326 NLRB at 1245; *see* Joint App'x at 27–28 (Board Dec. at 27–28). Quickway "should not be able to knowingly benefit from its unlawful conduct." *Westchester Lace*, 326 NLRB at 1245.

Quickway's argument that restoration is an undue burden because its Louisville terminal would not be profitable given the loss of the Kroger contract is similarly unavailing. Loss of clients does not alone demonstrate that restoration is unduly burdensome because "[w]hen the Board orders the restoration of the status quo ante, it is understood that the order means 'as far as possible, given the economic realities faced by the employer at the time of compliance.'" *We Can, Inc.*, 315 NLRB 170, 175 (1994).

This background principle is reinforced in this case because the Board ordered both a "good-faith effort" and a tiered remedy. Joint App'x at 32 (Board Order at 32). The Board ordered Quickway to restore operations and "offer the unlawfully discharged unit employees full reinstatement to their former jobs," but "if those jobs no longer exist," Quickway must reinstate them to "substantially equivalent positions . . . to the extent that their services are needed at the Louisville terminal to perform the work that [Quickway] is able to attract and retain from The Kroger Company or new customers after a good-faith effort." *Id.* The Board continued that, if there are remaining unlawfully terminated employees, Quickway must reinstate them "to any

positions in its existing operations that they are capable of filling." *Id.* If there remain unlawfully terminated employees at that point, Quickway must place them "on a preferential hiring list" for future vacancies. *Id.*

Crucially, the Board order requires Quickway to make a "good-faith effort" to attract and retain business upon its restoration of operations. *Id.*; *see also id.* at 28 (Board Dec. at 28) (recognizing that an employer complies with a restoration order if it makes "a good-faith effort" to attract clients and restore business, even if it ultimately cannot "attract enough clients to restore" operations in full (citing *We Can, Inc.*, 315 NLRB at 175)). The Board's tiered reinstatement and "good-faith" requirement for restoration demonstrates sensitivity to the "economic realities" of re-opening a facility and rehiring staff. *We Can, Inc.*, 315 NLRB at 175. The Board's order provides Quickway subsequent steps to take if its initial efforts do not return all workers to the status quo, and reasonably demands a "good-faith effort" by Quickway. Joint App'x at 28 (Board Dec. at 28). This cabined remedy is, accordingly, not an undue burden. The Board, furthermore, made clear that, "[a]t the compliance stage of these proceedings, [Quickway] will have the opportunity to introduce evidence that was not available at the time of the unfair labor practice hearing to demonstrate that this restoration order would be unduly burdensome." *Id.* at 28 (Board Dec. at 28 n.68); *see also Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984) (explaining that "compliance proceedings provide the appropriate forum" to "tailor[] the remedy to suit the individual circumstances").

Finally, Quickway's argument is bare: Quickway offers no evidence of the actual costs it will incur if ordered to reopen. *See* D. 35 (Quickway Br. at 56–60). Quickway's "bare statements about the economic costs of [reopening] fail to meet [the] 'undue burden' test." *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 315 (D.C. Cir. 2003). Given the "special respect" owed to the Board's "choice of remedy," the Board's tiered remedy, as well as the compliance proceedings available to Quickway before the Board, we will not disturb the Board's restoration and reinstatement order. *Gissel Packing*, 395 U.S. at 612 n.32. Quickway has not shown that the Board abused its discretion in ordering restoration of operations and reinstatement of employees.

Quickway additionally argues that the Board's "backpay award is punitive and unreasonable under the circumstances," and that the Board erred when it imposed "make whole remedies for any loss of earnings or other benefits; . . . other foreseeable pecuniary harms suffered; and . . . compensation for affected laid off employees for adverse tax payments of recovering 'lump sum' payments." D. 35 (Quickway Br. at 59–60). Contrary to Quickway's assertion, an award of backpay and reinstatement is explicitly contemplated by the Act. The Act expressly directs the Board, upon a finding of a violation, "to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of" the Act. 29 U.S.C. § 160(c). "[T]he Board did not abuse its discretion in ordering the traditional remedy of reinstatement, employment, and backpay for the discriminatees," and Quickway presents no evidence to the contrary. *Ky. Gen., Inc. v. NLRB*, 177 F.3d 430, 439 (6th Cir. 1999).

The General Counsel argues that we do not have jurisdiction to consider Quickway's argument on the make-whole remedy because Quickway did not raise it before the Board. D. 45 (NLRB Br. at 56). In response, Quickway argues that "Section 10(e) functions as a claim-processing rule, not a jurisdictional" one, so we can, nonetheless, address the argument. D. 53 (Reply at 25). We agree with the Board, and every other circuit to reach this issue, that the provision in § 10(e) barring our consideration of objections not raised before the Board should be considered jurisdictional, not merely a claim-processing rule. The Supreme Court, starting with *Arbaugh v. Y&H Corp.* in 2006, established a presumption against reading statutory requirements as jurisdictional unless Congress clearly states otherwise. 546 U.S. 500, 515 (2006). This approach has brought "some discipline to the use of the term 'jurisdictional.'" *Santos-Zacaria v. Garland*, 598 U.S. 411, 421 (2023) (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). And the Court has "repeatedly warned lower courts against confusing 'claim-processing rules . . .' with true 'jurisdictional limitations.'" *Pub. Serv. Co. v. NLRB*, 692 F.3d 1068, 1076 (10th Cir. 2012) (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010)). We don't take this direction "lightly." *Wilkins v. United States*, 598 U.S. 152, 158 (2023). Yet § 10(e) satisfies this clear-statement rule through its text, context, and function.[7]

---

[7]In *Woelke & Romero Framing, Inc. v. NLRB*, the Supreme Court held that, under Section 10(e) of the Act, courts "lack[] jurisdiction to review objections that were not urged before the Board." 456 U.S. 645, 665–66 (1982).

The language of § 10(e) itself indicates a jurisdictional rule. It states that no unraised objections "shall be considered by the court," using mandatory language that limits the court's power to act. 29 U.S.C. § 160(e). This phrasing focuses on the court's authority rather than imposing procedural obligations on litigants, which is characteristic of jurisdictional rules as opposed to claim-processing requirements. *See Arbaugh*, 546 U.S. at 515 (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)); *Reed Elsevier*, 559 U.S. at 161 (reasoning that a statute imposes a jurisdictional limit on the courts when it "speak[s] to the power of the court rather than to the rights or obligations of the parties." (citation omitted)).

The statutory context reinforces this interpretation. *See* 29 U.S.C. § 160(e). The sentence directly preceding the relevant clause states that upon filing a petition, the court "shall have *jurisdiction* of the proceeding and of the question determined therein." *Id.* (emphasis added). It then immediately states that no unraised objections "shall be considered by the court," making clear that reviewing issues that have not been brought before the Board is beyond a court's jurisdiction. The direct reference to jurisdiction in the adjacent text provides a clear indication of the provision's jurisdictional character.

We join our sister circuits in determining that § 10(e) creates a jurisdictional rule. *Pub. Serv. Co.*, 692 F.3d at 1076 (Gorsuch, J.); *Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1328 (D.C. Cir. 2012); *New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272, 280 (3d Cir. 2024). Ruling otherwise would create a circuit split where none currently exists. As these circuits recognized, following *Arbaugh*, we must "distinguish carefully" between jurisdictional and claim-processing rules. *Chevron Mining*, 684 F.3d at 403. Taking these warnings seriously, each circuit to examine § 10(e)'s text, structure, and history in the wake of *Arbaugh* has concluded that it is jurisdictional. Likewise heeding these warnings, we do the same.

The dissent primarily relies on the Supreme Court's opinion in *Santos-Zacaria v. Garland* to show that the exhaustion rule here is not jurisdictional. 598 U.S. at 417. That case involved a statutory provision in the Immigration and Nationality Act ("INA") requiring noncitizens to raise all issues before the Board of Immigration Appeals to preserve them for

---

We have long followed *Woelke & Romero Framing*. *See S. Moldings, Inc. v. NLRB*, 728 F.2d 805, 806 (6th Cir. 1984) (en banc). We explain in text why this is still applicable law.

judicial review—a classic administrative-exhaustion requirement. *Id.* at 416. The Court called an exhaustion requirement a "quintessential claim-processing rule" but noted it could be jurisdictional if it contained a clear statement from Congress "on par with express language addressing the court's jurisdiction." *Id.* at 417–20. The Court ultimately concluded that the INA exhaustion rule was not jurisdictional given the text and structure of that statute. It emphasized that the relevant provision stated that the petitioner must "exhaust[] all administrative remedies available" before seeking judicial review and did not speak in jurisdictional terms. *Id.* at 416 (quoting 8 U.S.C. § 1252(d)(1)). That was particularly telling given that neighboring provisions were "plainly jurisdictional" and explicitly spoke in jurisdictional terms. *Id.* at 419 & nn.5–6. As the dissent highlights, the INA does speak to the court's power, stating "[a] court may review a final removal order only" after exhaustion of administrative remedies; and the Supreme Court did not read this focus on the court's review sufficient to deem the exhaustion requirement jurisdictional. *Id.* at 420. That's because, the Court explained, the statute is not "focused solely on the court," and "requires that '*the alien* has exhausted' certain remedies"—so it "speaks to a party's procedural obligations as well, just like a nonjurisdictional claim-processing rule." *Id.* (internal quotation marks and alterations omitted). Given that the INA's exhaustion requirement did not use jurisdictional language as in its adjacent provisions, and the statute directly obligated the petitioner to exhaust as would a typical claim-processing rule, the Court concluded that the government could not overcome the presumption against jurisdictional treatment. *Id.* at 419.

The provision in § 10(e), however, is markedly different. Consider the key distinctions. The INA provision examined in *Santos-Zacaria* used the word "exhaustion" and did not mention jurisdiction (as the statute did in other provisions). *Id.* at 419. In contrast, § 10(e) does not mention "exhaustion" and is framed in explicitly jurisdictional terms. The INA's exhaustion requirement directly imposed procedural obligations on the petitioner. Section 10(e), however, is "focused solely on the court" and the court's power to consider certain matters. *See id.* at 420.

Furthermore, the structure of § 10(e) differs significantly from provisions found to be non-jurisdictional in other cases. For instance, in *Henderson v. Shinseki*, the Court determined that the 120-day filing deadline for Department of Veterans Affairs benefits was not jurisdictional. 562 U.S. at 431. The Court's reasoning hinged largely on two factors: first, the

"provision does not speak in jurisdictional terms or refer in any way to the jurisdiction of the Veterans Court"; second, the provision's placement within the "Procedure" subchapter reinforced its non-jurisdictional nature. *Id.* at 438–39 (cleaned up); *see Zipes*, 455 U.S. at 394 (reasoning that the a provision that requires litigants to file a timely charge with the EEOC before filing in court was not jurisdictional in part because "[t]he provision specifying the time for filing charges with the EEOC appears as an entirely separate provision, and it does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts")). Unlike in *Henderson*, the relevant clause in § 10(e) is directly linked to the jurisdictional grant, which is contained within the same statutory section. *See* 29 U.S.C. § 160(e) ("Upon the filing of [a] petition [by the Board to enforce its order], the court shall . . . have jurisdiction of the proceeding and of the question determined therein [.]"). This strongly suggests that Congress intended the provision to be jurisdictional in nature.

Although § 10(e) includes an exception—allowing courts to review new issues in "extraordinary circumstances,"—that does not negate its jurisdictional character. In *Bowles v. Russell*, decided one year after *Arbaugh*, the Supreme Court held that the notice of appeal filing deadline was jurisdictional despite recognizing limited exceptions. 551 U.S. 205, 214 (2007); Fed. R. App. P. 4(a)(5)(A)(ii) (allowing a district court to extend the time for appeal upon a showing of "excusable neglect or good cause"). Similarly, the narrow exception in § 10(e) can coexist with the statute's jurisdictional nature. While courts have become more cautious about labeling requirements as jurisdictional post-*Arbaugh*, § 10(e) meets the higher bar. Its placement within a jurisdictional section, its direct limitation on court power, and its focus on the court's authority rather than litigant obligations all point to a clear congressional intent to make this provision jurisdictional, distinguishing it from the non-jurisdictional provision in *Santos-Zacaria*.

Because Quickway did not raise any argument about the make-whole remedy before the Board—either prior to the Board's decision or in a motion for reconsideration, we do not have jurisdiction to consider the argument.

### III. CONCLUSION

For the foregoing reasons, we **DENY** Quickway's petition for review and **GRANT** the Board's cross-application for enforcement of its order in full.

---

**CONCURRING IN THE JUDGMENT**

---

MURPHY, Circuit Judge, concurring in the judgment. I agree with my colleagues that we must reject Quickway Transportation's many challenges to the order of the National Labor Relations Board in this case. The Board held that Quickway violated 29 U.S.C. § 158(a)(1), (a)(3), and (a)(5) when defending against unionization efforts at its Louisville terminal and when later closing that terminal. *See Quickway Transp., Inc.*, 372 N.L.R.B. No. 127, 2023 WL 5528976, at *30–31 (Aug. 25, 2023). In our court, Quickway chose to argue primarily over the facts. Yet these arguments trigger a deferential standard of review. We must treat as "conclusive" the Board's findings of historical fact "if supported by substantial evidence on the record considered as a whole[.]" 29 U.S.C. § 160(e); *see NLRB v. Wehr Constr., Inc.*, 159 F.3d 946, 950 (6th Cir. 1998). With this fact-bound briefing strategy, Quickway simply accepted the validity of the Board's legal views about what the relevant statutes require. I write to make clear that we need only *assume* these legal views to resolve this case. That is true for the following challenges.

1. *Duty to Bargain over Closure*. The National Labor Relations Act prohibits several "unfair labor practices" by employers. 29 U.S.C. § 158(a). Quickway's decision to close its Louisville terminal implicated two of § 158(a)'s prohibitions that the Supreme Court interpreted in a pair of decisions: *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981), and *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263 (1965). *Darlington* first addressed § 158(a)(3). This paragraph makes it an "unfair labor practice for an employer" "to encourage or discourage membership in any labor organization" "by discrimination in regard to hire or tenure of employment or any term or condition of employment[.]" 29 U.S.C. § 158(a)(3). The employer in *Darlington* closed a plant in response to its workers' decision to unionize the plant. 380 U.S. at 265–66. The Court initially held that an employer's decision to "go completely out of business" in response to a unionization effort did not violate § 158(a)(3). *Id.* at 269–74. But uncertainty existed over whether the employer operating this plant formed part of a broader entity that ran several other plants. So the Court

next asked whether a *partial* closure could violate § 158(a)(3).  It held that such a closure could amount to "discrimination in regard to . . . tenure of employment" in specific circumstances. 29 U.S.C. § 158(a)(3); *see Darlington*, 380 U.S. at 274–76.  In particular, a closure of a plant violates § 158(a)(3) if: the employer has a sufficient interest in other businesses that remain open; the employer closed the plant with the intent to discourage unionization at these other businesses; and it was "realistically foreseeable" that the plant closure would lead employees in the other businesses to fear that the employer would also close those businesses if they attempted to unionize.  *See Darlington*, 380 U.S. at 275–76.

*First National Maintenance* next addressed § 158(a)(5).  That paragraph makes it an "unfair labor practice for an employer" "to refuse to bargain collectively with the representatives of his employees[.]"  29 U.S.C. § 158(a)(5).  But the statute clarifies that an employer's duty to bargain exists only "with respect to wages, hours, and other terms and conditions of employment" for its employees.  *Id.* § 158(d).  The employer in *First National Maintenance* terminated a maintenance-services contract with a nursing-home customer (and laid off the employees who worked for this customer) without negotiating with the union.  452 U.S. at 668–70.  The Court asked whether the refusal to negotiate over this decision violated § 158(a)(5). After balancing the interests on both sides, it held that the employer's closure of part of the business did not fall within the "terms and conditions" of employment that triggered a duty to bargain.  *Id.* at 686 (quoting 29 U.S.C. § 158(d)).  When discussing the "limits of [its] holding," though, the Court flagged that the union did *not* allege that the employer had acted with any "antiunion animus."  *Id.* at 687.

The combination of *Darlington* and *First National Maintenance* leaves one legal question unanswered: Suppose an employer *does* close part of its business and terminate employees out of antiunion animus.  Would this fact establish *only* a violation of § 158(a)(3)'s antidiscrimination rule under *Darlington*?  Or might the antiunion animus also suffice to distinguish *First National Maintenance* and trigger a duty to negotiate over the partial closure under § 158(a)(5)?  The Court has not decided this question.  The Board, by contrast, has long held that § 158(a)(5) requires employers to bargain over partial closures driven by antiunion animus.  *See Delta*

*Carbonate, Inc.*, 307 N.L.R.B. 118, 122 (1992); *Strawsine Mfg. Co.*, 280 N.L.R.B. 553, 553 (1986).

This backdrop sets the stage for this case. The Board held that Quickway decided to close its Louisville terminal on prohibited antiunion grounds. Based on that factual finding, the Board invoked *Darlington* to conclude that Quickway violated § 158(a)(3) by discriminating against its employees for their unionization efforts. *See Quickway Transp.*, 2023 WL 5528976, at *8–22. And the Board invoked its reading of *First National Maintenance* to conclude that Quickway violated § 158(a)(5) by failing to negotiate with the union over the closure. *See id.* at *22.

Yet I view the Board's reading of *First National Maintenance* as open to serious question. According to *First National Maintenance*, a partial closure is not a "term" or "condition" of employment subject to bargaining under § 158(a)(5) and (d). According to the Board, the closure becomes such a term or condition if the employer bases it on antiunion animus. As a textual matter, how can the motive for a partial closure make the closure a "term" or "condition" of employment? In my view, the closure should qualify as such a "term" or "condition" or it should not. I do not see how this text could be read to make the employer's intent relevant. As a precedential matter, *First National Maintenance* recognized the possibility of antiunion animus and protected against it in other ways. An employer does have a duty to bargain over the "effects" of a partial closure under § 158(a)(5). *See First Nat'l Maint.*, 452 U.S. at 681–82. And if the employer made the closure decision out of "antiunion animus," the decision might violate *Darlington*'s reading of § 158(a)(3)'s antidiscrimination rule. *See id.* at 682. So I see no need to turn § 158(a)(5) into a chameleon to achieve the policy goal of protecting against this antiunion animus. The Fourth Circuit agrees. While highlighting these other protections, it recognized that "the phrase 'terms and conditions of employment' does not magically change meaning with the infusion of anti-union animus." *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 844 (4th Cir. 2000). And although the Seventh Circuit seems to have accepted the Board's view, it did so with almost no analysis on this issue. *See NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1315–16 (7th Cir. 1998).

At day's end, though, I would not decide this legal question (and enter a circuit split) without briefing from the parties. Quickway's briefing chose *not* to challenge the Board's legal interpretation of *First National Maintenance*. The company instead challenged only the Board's factual finding that it closed the Louisville terminal for antiunion reasons. Petitioner's Br. 34–44, 46–55. I agree that substantial evidence supported the Board's animus finding under our deferential standard of review. That conclusion suffices to resolve this case. We can save the validity of the Board's reading of *First National Maintenance* for another time.

2. *Duty to Bargain over "Effects" of Closure*. Given *First National Maintenance*, Quickway concedes that § 158(a)(5) required it to bargain over the "effects" of its decision to close the Louisville terminal (which resulted in layoffs). *See* 452 U.S. at 681–82. Quickway claimed that it met this duty by offering to bargain over these effects on the day of the closure. The Board rejected this argument based in part on the following legal rule: an employer's failure to bargain over a decision on which it had a duty to bargain (here, the closure of the terminal) *automatically* shows that the employer violated its duty to bargain over the effects of that decision. *See Quickway Transp.*, 2023 WL 5528976, at *22 n.55. Although the Board's order relied on this legal rule, Quickway did not challenge the rule in its opening brief. Petitioner's Br. 45–46. Nor did Quickway dispute the rule in its reply brief after the Board cited it in this court. Reply Br. 23–24. Without any briefing on this rule, I would not opine on its validity. I instead would hold that Quickway forfeited any challenge to the rule. And the (unchallenged) rule suffices to reject Quickway's argument that it engaged in adequate "effects" bargaining. *Cf. Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 884 (6th Cir. 2024).

3. *Revocation of Settlement Agreements*. Before closing the terminal, Quickway entered into settlement agreements with the Board over alleged unfair labor practices that occurred during the unionization efforts. But the Board later upheld its General Counsel's decision to set aside these settlements on the ground that Quickway committed new unfair labor practices after the settlements. *See Quickway Transp.*, 2023 WL 5528976, at *23 (quoting *Twin City Concrete*, 317 N.L.R.B. 1313, 1313 (1995)). If the settlement agreements made this post-settlement compliance a contractual term between the parties, this holding would enforce the agreements as written. But the Board's rule suggests that it may set aside agreements for post-settlement

violations even if an agreement did *not* include such a term. It is not clear to me what law gives the Board this power.

Yet again, we need not reach this legal question. Quickway devotes six lines of text to challenge the General Counsel's decision to set aside the settlement agreements. Petitioner's Br. 55. Because the company argues *only* that it did not commit a post-settlement violation, we may assume the Board's general authority to set aside settlement agreements. And because we have rejected Quickway's fact-based argument that it did not commit post-settlement violations, I would deny its challenge to the General Counsel's decision on that basis alone.

4. *McCurry's Interrogation*. Section 158 also makes it "an unfair labor practice for an employer" "to interfere with, restrain, or coerce employees in the exercise of" their rights to join a union. 29 U.S.C. § 158(a)(1). The Board held that Jeff McCurry, the Louisville terminal's manager, violated § 158(a)(1) when he "interrogated" employees about what they discussed with union representatives during a "job action" in front of the terminal. *Quickway Transp.*, 2023 WL 5528976, at *29–30. In the abstract, I find the Board's ultimate "coercion" conclusion debatable. As the dissent at the Board noted, the record contains no testimony from McCurry or employees about the nature of his questioning. *See id.* at *43 (Kaplan, J., dissenting). Was it, for example, hostile or friendly? And our cases have long held that questioning employees alone does not violate § 158(a)(1). *See NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 548 (6th Cir. 1984); *NLRB v. Paschall Truck Lines, Inc.*, 469 F.2d 74, 76 (6th Cir. 1972) (per curiam).

I thus would resolve this claim on narrower grounds. In its page of briefing on this subject, Quickway specifically challenges only the Board's subsidiary findings about the historical facts (not its ultimate "coercion" conclusion). The company argues that we must accept McCurry's "uncontradicted testimony" that he did not approach any employees *on his own* and discussed the issue only with those "who approached him." Petitioner's Br. 65. Quickway adds that "no direct evidence" shows what he "asked or said" to these employees. *Id.* at 65–66. Yet substantial evidence supported the Board's contrary views. *See Quickway Transp.*, 2023 WL 5528976, at *29–30. McCurry's own internal email noted that he would "try to find out what the discussion [is]." *Id.* at *5. The Board could rely on this email to find that McCurry initiated the conversations. And a later email showed that McCurry discussed the

employees' conversations with the union representatives during the job action. *Id.* The Board could rely on this email to find that he asked about the unionization efforts. We need not say more to reject Quickway's conclusory challenge.

5. *Quickway's "Secondary" Conduct Defense*. Quickway argued to the Board that the union threatened a strike in the media to harm Kroger (not just Quickway) and that this threat to Kroger qualified as illegal "secondary" conduct. *See* 29 U.S.C. § 158(b)(4)(ii)(B). The company then cited Board precedent for the rule that an employer may escape liability for unlawful activity if it undertook the activity in *response* to the union's illegal secondary conduct. *See Preferred Building Servs.*, 366 NLRB No. 159, 2018 WL 4106356, at *4–6 (Aug. 28, 2018), *rev'd and remanded Serv. Emps. Loc. 87 v. NLRB*, 995 F.3d 1032 (9th Cir. 2021); *see also Nat'l Packing Co. v. NLRB*, 352 F.2d 482, 485 (10th Cir. 1965). I agree that substantial evidence supports the Board's rejection of this defense because Quickway lacked a reasonable basis to believe that the union made the illegal threat in the media. *See Quickway Transp.*, 2023 WL 5528976, at *15 n.38. I thus would leave open the legal question whether Quickway could have avoided liability for its unlawful conduct if it had engaged in that conduct in response to the union's own illegal activity.

6. *Remedies*. Quickway lastly criticizes two aspects of the Board's required remedies. *First*, Quickway challenges the Board's order requiring the company to restore its operations at the Louisville terminal by breaching its lease with the current tenant, reacquiring trucks, and seeking new business from Kroger. *See Quickway Transp.*, 2023 WL 5528976, at *31–34. The National Labor Relations Act allows the Board to issue orders directing an employer that commits an unfair labor practice "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of" the Act. 29 U.S.C. § 160(c). If the Fourth Circuit correctly held that the Act (in particular, § 158(a)(5)) gives Quickway the sole authority to decide whether to close part of its business free from any union input, I find it hard to see how the restoration of that business would comport with the "policies" of the Act. *Id.* § 160(c); *see Dorsey Trailers*, 233 F.3d at 841–44. And while such a closure might violate § 158(a)(3) if it leads to layoffs based on antiunion animus, *see Darlington*, 380 U.S. at 275–76, that paragraph bars "discrimination in regard to *hire or tenure* of employment or

any *term or condition* of employment," 29 U.S.C. § 158(a)(3) (emphasis added). So how could the paragraph justify anything more than the "reinstatement" and "backpay" that the Board separately ordered for the affected employees? *Id.* § 160(c); *see Quickway*, 2023 WL 5528976, at *34. I am not sure.

As I read Quickway's brief, though, it does not question the Board's authority to impose this restoration order. Rather, it makes one last fact-bound attack: that restoration of the terminal would be "unduly burdensome." Petitioner's Br. 57. But, as my colleagues recognize, Quickway raises bare-bones factual arguments to support this undue-burden claim. Those arguments cannot overcome our deferential standard of review for this type of claim.

*Second*, Quickway argues that the Board granted illegal "consequential damages" to the laid-off employees. *Id.* at 59. I agree that the statutory exhaustion requirement prohibits us from considering this claim. The statute provides: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Yet Quickway did not challenge this aspect of the Board's remedy in a motion for reconsideration, which our cases seemingly require. *See Van Dorn Plastic Mach. Co. v. NLRB*, 881 F.2d 302, 306 (6th Cir. 1989). And because the Board raised Quickway's failure to exhaust, this requirement would bar Quickway's claim whether we characterize it as a jurisdictional rule or as a claim-processing rule. *Cf. Saleh v. Barr*, 795 F. App'x 410, 424 (6th Cir. 2019) (Murphy, J., concurring). So I see no need to decide whether it is jurisdictional.

Since my colleagues answer this question, though, I will do so as well: I would not read the exhaustion mandate as jurisdictional. The Supreme Court just recently called "an exhaustion requirement" in the immigration context the "quintessential claim-processing rule." *Santos-Zacaria v. Garland*, 598 U.S. 411, 417 (2023). Courts thus should identify "unmistakable evidence" in the statutory scheme before they treat this type of requirement as one that limits our jurisdiction. *Id.* at 418. And like Judge Krause, I do not see such evidence in § 160(e). *See New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272, 296–99 (3d Cir. 2024) (Krause, J., concurring).

If anything, the statutory language makes the exhaustion requirement a claim-processing rule. Section 160(e) grants jurisdiction to a court when the Board seeks to enforce its order, while § 160(f) grants jurisdiction to a court when a person aggrieved seeks review of that order. I read both subsections to grant a court jurisdiction as long as one requirement has been met: the filing of a petition for review. Under either subsection, "[*u*]*pon the filing of such petition*, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein[.]" 29 U.S.C. § 160(e) (emphasis added); *see id.* § 160(f). And while § 160(e) then imposes the exhaustion requirement, I would not view that requirement as jurisdictional simply because it falls within the same subsection as this jurisdictional grant. After all, § 160(e) also imposes other procedural requirements on courts (such as the requirement to treat the Board's factual findings as "conclusive" "if supported by substantial evidence") that nobody would treat as jurisdictional. I would read the exhaustion requirement the same way. At the least, this reading strikes me as "plausible"—all that is required to make it a claim-processing rule. *Santos-Zacaria*, 598 U.S. at 416 (citation omitted).

As additional support for my reading, jurisdictional rules typically lack "equitable exceptions" to their requirements. *Id.* But § 160(e)'s exhaustion requirement comes with a built-in equitable exception: Courts may consider unexhausted claims if they identify "extraordinary circumstances" for a petitioner's failure to raise a claim. 29 U.S.C. § 160(e). I would not have interpreted Congress to have tied a jurisdictional mandate to such a vague standard. After all, the Court presumes that Congress imposes "clear boundaries" in its "jurisdictional statutes." *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 11–12 (2015); *see Sysco Grand Rapids, LLC v. NLRB*, 825 F. App'x 348, 357 (6th Cir. 2020).

My colleagues' responses do not convince me otherwise. They point out that § 160(e)'s exhaustion text ("[n]o objection . . . shall be considered by the court") imposes a limit on the *court*—rather than a condition on a *petitioner*. Yet the Supreme Court rejected the same argument when finding the exhaustion requirement in the immigration context nonjurisdictional. *See Santos-Zacaria*, 598 U.S. at 420. And while one of the Court's older decisions described this requirement as jurisdictional, *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645,

665–66 (1982), earlier cases in the immigration context likewise called a (predecessor) exhaustion requirement jurisdictional, *see Santos-Zacaria*, 598 U.S. at 421.  Like these earlier immigration cases, *Woelke* did not distinguish "between 'jurisdictional' rules (as we understand them today) and nonjurisdictional but mandatory ones." *Santos-Zacaria*, 598 U.S. at 421.  So the Court's modern cases "portend[] a different outcome" from *Woelke*. *New Concepts for Living*, 94 F.4th at 299 (Krause, J., concurring).

For the foregoing reasons, I concur in the judgment.